## AUSTIN JOHANNA v. THOMAS LENNON and A. L. Larson.

### (155 N. W. 685.)

**Fraud — duress — want of consideration — recovery — defeat of — action — negotiable check — indorse — infirmity — defect — bad faith.**

1. In order to defeat recovery on the ground of fraud, duress, or want of consideration between the original parties, in an action by an indorsee against the maker of a negotiable check, complete and regular on its face, which was acquired by the indorsee for value before it was overdue or dishonored, it must be shown that the indorsee had actual knowledge of the infirmity or defect

Note.—On the general question of circumstances sufficient to put purchaser of negotiable paper on inquiry, see note in 29 L.R.A. (N.S.) 351.

As to effect of fraud in inception of negotiable paper on rights of bona fide purchaser, see note in 11 Am. St. Rep. 309.

or knowledge of such facts as to amount to bad faith. American Nat. Bank **v.** Lundy, 21 N. D. 167, followed.

**Indorsee — in due course — check — defenses — original parties.**

2. It is *held* that the plaintiff is an indorsee in due course and as such holds the check involved in this action free from the defenses of fraud and duress and want of consideration, even though such defenses existed between the original parties.

Opinion filed November 16, 1915.

Appeal from a judgment of the District Court of Williams County, *Fisk*, J. Defendant Larson appeals.

Affirmed.

*Wm. G. Owens* and *E. A. Lohrke*, for appellant.

The evidence does not show that there was any consideration for the check upon which suit is brought. A third party takes a check subject to all defenses, and can receive no better title than the payee had. Comp. Laws 1913, § 7073.

Where fraud is shown at the inception of a negotiable instrument, the burden of proof of "holding in due course" is upon the holder. First Nat. Bank v. Flath, 10 N. D. 281, 86 N. W. 867; Vannatta v. Lindley, 198 Ill. 40, 92 Am. St. Rep. 270, 64 N. E. 735; Thompson v. Sioux Falls Nat. Bank, 150 U. S. 231, 37 L. ed. 1063, 14 Sup. Ct. Rep. 94; Abbott v. Rose, 62 Me. 194, 16 Am. Rep. 427.

The maker has the right to intercept and cancel such an instrument at any time before it is honored and paid by the bank on which it is drawn. Yakima Valley Bank v. McAllister, 1 L.R.A.(N.S.) 1075, note, and cases there cited.

*Thomas M. Cooney*, for respondent.

It is only incumbent upon an indorsee of a negotiable check taken over by him before due or dishonored, to prove that he is the holder in due course, in good faith, and that he is a bona fide holder without notice of any defect. Rosenstein v. Berman, 116 Minn. 231, 133 N. W. 792.

Our statute presumes that any such instrument is issued for a valuable consideration. Comp. Laws 1913, § 6909.

The rule is that such an instrument is valid in the hands of a good-faith purchaser and holder, unless there is a statute declaring otherwise,

even though founded upon an illegal consideration. Comp. Laws 1913, § 6904; Rev. Cases 1905, § 6320, Comp. Laws 1913, § 6903; Arnd v. Sjoblom, 131 Wis. 642, 10 L.R.A.(N.S.) 842, 111 N. W. 666, 11 Ann. Cas. 1181; Union Trust Co. v. Preston Nat. Bank, 136 Mich. 460, 112 Am. St. Rep. 370, 99 N. W. 399, 4 Ann. Cas. 353; Drinkall v. Movius State Bank, 11 N. D. 10, 57 L.R.A. 341, 95 Am. St. Rep. 693, 88 N. W. 724.

CHRISTIANSON, J. The plaintiff in this action seeks to recover of the defendant Larson, as maker, and the defendant Lennon, as indorser, upon the following check:—

| | | | |
|---|---|---|---|
| Schafer, N. D. | *April 19 1909* | No. ——— | |
| | McKenzie County Bank | | |
| Pay to *Thomas Lennon* | | or order, | *$150.00.* |
| *One Hundred fifty* | | | Dollars |
| | | *A. C. Larson* | |

The complaint in substance alleges the execution and delivery by Larson to Lennon of the check; that Larson executed the check under the name of A. C. Larson, and falsely represented and pretended in the issuance of said instrument that this was in truth and fact his name, whereas his real name is A. L. Larson; that the defendant Thomas Lennon thereafter in due course of business for value transferred and assigned the check to the plaintiff by indorsing upon the back of said instrument his (Lennon's) name, and that plaintiff thereby became and is the owner and holder of the instrument; that the check was presented for payment to the bank on which it was drawn, and payment refused.

The answer admits the execution and delivery of the check and that payment was refused; and alleges that the same is without consideration, and that defendant's signature thereto was obtained solely by duress and fraud. The answer further denies that plaintiff is the holder of the instrument in due course, and alleges that plaintiff, prior to the

time of the transfer of the check to him, had actual notice that the check was without consideration, and that defendant's signature thereto was obtained by duress and fraud. The case was tried to a jury, but at the close of the testimony both parties moved for a directed verdict, whereupon the court discharged the jury, and subsequently made findings of fact and conclusions of law in favor of the plaintiff. Judgment was entered upon such findings, and the defendant Larson appeals from such judgment.

The sole question presented on this appeal is whether plaintiff was the good-faith holder of the check, in due course and for value. The evidence shows that on the day the check was issued, the defendant Larson was in Williston, where he and other parties played a game of poker. Some time after the game, the appellant gave the check which is involved in this action. The defendant Larson denies that he owed any money on account of the poker game.

Upon his direct examination he gives the following version of the execution and delivery of the check:

Q. Will you tell the jury how it happened that you gave this check, exhibit 12?

A. After we got through playing I went to a room—they had some whisky there, them fellows, and had been drinking, so I don't remember just exactly when I went into a room, but they had a room there, and they put me in that room, and some time during the night this Minneapolis man came in there, and he says: "I want that check now for $150," he said. I laid in bed there. He picked up my coat and got the check book, and he furnished the fountain pen, and he gave it to me, and I wrote it out to him, I signed it "A. C. Larson," so that I would be there with the check—if it would beat me to the bank I could get there and countermand it.

On his cross-examination he testified as follows:

Q. I show you a paper marked exhibit 1, and state if you ever saw that exhibit before?

A. Yes, sir.

Q. You wrote that instrument out, did you not?

A. Yes, sir.

Q. And signed it "A. C. Larson?"

A. Yes, sir.

Q. Drew it upon the McKenzie County Bank?

A. Yes, sir.

Q. For the sum of $150?

A. Yes, sir.

Q. And delivered it to Mr. Lennon?

A. No, sir.

Q. Who did you deliver it to?

A. It was another gentleman that came i.. my room and asked me to write the check in that name; I didn't know either one of them.

Q. And you wrote it in the name of Thomas Lennon?

A. He told me Thomas Lennon.

Mr. Lennon gives the following version of his connection with the transaction:

Q. You may state to the jury under what conditions you came in possession of that check?

A. This Minneapolis man that Mr. Larson speaks of, he is a Berthold man, his name is Patton, and the time I was working at Mondak he was a customer of mine. I had been in Williston—practically made my headquarters here at that time, and he came to me in the evening— I was laying in bed, rather the next morning after this supposed transaction happened, and he says, "I have a poker game here," and he says, "This man owes me a hundred and fifty dollars," and he says, "I wish," he says, "that you would let me make it out in your name because I am unknown in Williston—can't get it cashed." I says, "Sure, it is all right with me." Knowing that Mr. Larson was treasurer of McKenzie County, and Patton being a friend of mine and good customer, I knew they were both financially responsible, and I went down upon the street with this Mr. Patton and this check—the first man I saw was Mr. Johanna. At that time the hotel—I have forgotten the name of it— was run, I think was run,—it was called the Williston at that time.

Q. Were you present when that check was made out?

A. No, sir.

Q. And Mr. Patton came along out after you?

A. Yes, sir, but it is so long ago I can't recall it exactly, but it occurred to me Mr. Larson and he both, but Mr. Patton had the check in his possession and the first man I saw that I knew was Mr. Johanna and it was after banking hours. I says, "Joe, have you got any

money?" and he says, "Yes, I have got a little." "Have you got a hundred and fifty dollars?" "No." I told him there was a man here wanted to get away—he wanted this check cashed. He says, "I will give you $50 and my personal check." I says, "That is all right," and that was the way the transaction was done. I have never seen Mr. Patton since as I remember of; I don't think I have seen Larson until this morning.

Q. You got the hundred and fifty dollars from Johanna?

A. Yes.

Q. Were you in this poker game?

A. No, sir.

Q. Had nothing to do with it?

A. Not a thing, in fact, I couldn't swear that they were playing poker; I didn't see them play.

Q. Mr. Johanna didn't know what the check was given for?

A. No, sir, he didn't; he did it for me, as a personal favor to me.

Q. You have never paid Mr. Johanna anything on that check?

A. No, not a cent.

Mr. Johanna, the plaintiff, testified as follows regarding the cashing of the check:

Q. State to the jury how you cashed that check?

A. Mr. Lennon came in and asked me if I could cash a check, as the bank was closed; he asked me if I had any money, I said I did. He wanted me to cash the check. I told him I didn't have cash enough. He says, "Give me what cash you got and give me your personal check for the balance," and I did.

Q. How much cash did you give him?

A. Fifty dollars.

Q. And the balance?

A. Personal check for $100.

Q. Was that check afterwards returned to your account?

A. Yes, sir.

Q. Charged to your account?

A. It was.

Q. Paid?

A. It was.

The following facts are established by the undisputed testimony:

Thomas Lennon did not participate in the poker game, nor was he in the room while it was going on. The plaintiff, Johanna, cashed the check in good faith, paying Lennon the full amount thereof, without any actual notice or knowledge that the check was given without consideration. The check was regular and valid on its face, and properly indorsed by Lennon.

The evidence clearly is insufficient to establish the defenses of fraud and duress. Comp. Laws 1913, §§ 5846, 5848–5850. Nor is there any positive evidence that the check was issued in a gambling transaction, although the evidence raises a strong suspicion that such is the fact. There is, however, the positive testimony of Larson that he received no consideration for the check.

The check was a negotiable instrument. Comp. Laws 1913, § 6886, regular on its face, and regularly transferred to plaintiff, by the indorsement of the payee named therein, for value.

Appellant's counsel assert that plaintiff is not a bona fide holder of the check without notice, but that certain statements made by Lennon at the time the check was cashed were sufficient to put plaintiff on his inquiry as to the alleged infirmity in the instrument. We have set out the testimony showing what occurred at the time the check was cashed; and it is difficult to see how it can be seriously asserted that anything said at that time could lead a reasonable man to the conclusion that any infirmity existed in the instrument.

In the case of American Nat. Bank v. Lundy, 21 N. D. 167, 129 N. W. 99, this court said: "This court held in First Nat. Bank v. Flath, 10 N. D. 281, 86 N. W. 867, on facts which we think make that case exactly in point, that where in an action on a negotiable note by an indorsee, the burden to prove a good-faith purchase has shifted to the plaintiff by the introduction of evidence showing fraud between the original parties thereto, the burden is sustained prima facie by showing a purchase for full value and before maturity. . . . In the same case it is held that good faith in the purchase of a negotiable note does not require the purchaser to make inquiries as to the purpose for which it was given or as to the existence of possible defenses, and that bad faith is imputed only from knowledge or notice of fraud or defenses, and that mere knowledge of suspicious circumstances will not defeat a recovery. The case cited was tried and decided before the enactment of the negotiable instruments law in this state, and if the law was cor-

rectly construed in the opinion from which we have quoted, the same principles apply with added force since the enactment of the negotiable instruments law, because we find that § 6358, Rev. Codes 1905, § 6941, Comp. Laws 1913, defines what constitutes notice of infirmity necessary to defeat recovery in a note obtained by fraud or negotiated in breach of faith. It reads: 'To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith.' . . . The negotiable instruments law and particularly § 6358, supersedes and renders inapplicable the old sections quoted above [§ 6703, Rev. Codes 1905, § 7290, Comp. Laws, 1913, relative to constructive notice], if they were ever applicable, to the purchaser of negotiable instruments, and the suspicions of knowledge of facts sufficient to put a party on inquiry as to defects in title no longer necessarily constitute notice, or charge a party with notice of defenses on the purchase of commercial paper. He must have actual knowledge of the infirmity of defect, or knowledge of such facts as amount to bad faith." See also discussion of First Nat. Bank v. Flath, supra, and American Nat. Bank v. Lundy, supra, in McCarty v. Kepreta, 24 N. D. 395, 414, 48 L.R.A.(N.S.) 65, 139 N. W. 992; Ann. Cas. 1915A, 834.

What was said by this court in American Nat. Bank v. Lundy, supra, applies with equal force in the case at bar, and fully disposes of the question raised by appellant on this appeal.

We concur in the conclusion reached by the trial court, that the instrument involved in this case is a negotiable instrument, and that the plaintiff is the holder thereof in due course (Comp. Laws 1913, § 6937) ; and, hence, holds the same free from the defenses sought to be asserted by the defendant Larson.    Comp. Laws 1913, § 6942; Drinkall v. Movius State Bank, 11 N. D. 10, 16, 57 L.R.A. 341, 95 Am. St. Rep. 693, 88 N. W. 724; Mooney v. Williams, 9 N. D. 329, 83 N. W. 237; 3 R. C. L. § 227; 5 R. C. L. §§ 56–60; Dan. Neg. Inst. § 197; Union Trust Co. v. Preston Nat. Bank, 136 Mich. 460, 112 Am. St. Rep. 370, 99 N. W. 399, 4 Ann. Cas. 347.

The judgment appealed from is affirmed.

All concur.